IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

OLGA TORRES, et al.,

Plaintiffs

v.                                          CIVIL 06-2158 (JAG)

BELLA VISTA HOSPITAL, INC., et al.,

Defendants

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the court on the parties' cross-motions for summary judgment as to the issue of the court's subject matter jurisdiction.  On November 24, 2008, plaintiffs Olga Torres and Pedro Bonilla filed their motion seeking a declaration that the court has jurisdiction under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.  (Docket No. 124.)  On the same day, co-defendants Bella Vista Hospital, Inc. ("Hospital"), Mr. Rubén Pérez and the conjugal partnership with his wife, Watson Wyatt Company ("Watson Wyatt"), and Banco Popular de Puerto Rico ("Banco Popular") filed a joint motion seeking a finding to the contrary.  (Docket No. 126.)  For the reasons set forth below, I recommend that plaintiffs' motion be DENIED and that defendants' motion be GRANTED.

I.    PROCEDURAL BACKGROUND

Plaintiffs filed the instant action on November 17, 2006, bringing multiple causes of action under ERISA, as well as various state law causes of action.

CIVIL 06-2158 (JAG)                         2

(Docket No. 1.)  The defendants filed separate motions to dismiss for lack of subject matter jurisdiction.  (Docket Nos. 34, 38, 45.)  On August 23, 2007, another magistrate judge issued a report and recommendation that concluded that defendants had failed to prove as a matter of law that ERISA was inapplicable to plaintiffs' benefit plan.  (Docket No. 73.)  The magistrate judge accordingly recommended that the motions to dismiss on the ground that the plan was a church plan be denied.  (Id. at 13.)

The district court adopted in part and modified in part the magistrate judge's report and recommendation.  Torres v. Bella Vista Hosp., Inc., 523 F. Supp. 2d 123, 128 (D.P.R. 2007).  The district court found that the question of whether the plan was a church plan was intertwined with the jurisdictional question, and the court opted to "defer resolution of the jurisdictional issue," id. at 135 (quoting Valentín v. Hosp. Bella Vista, 254 F.3d 358, 363 n.3 (1st Cir. 2001)), as there was "an apparent dispute as to the fact if the Plan [was] a church plan or a plan subject to ERISA." Id. at 135.  The court found the matter best presented "after the parties have an opportunity to narrow areas of factual dispute." Id.  On December 15, 2008, the court referred the cross-motions for summary judgment to me for a report and recommendation.  (Docket No. 148.)

CIVIL 06-2158 (JAG)                              3

## II.    FACTUAL BACKGROUND

As the court has already set forth the facts of this case in its previous opinion, I will incorporate, *mutatis mutandis*, the factual findings of that opinion. I will present only the essential facts relevant to the parties' cross-motions, as well as those facts newly manifested via the parties' statements of uncontested facts accompanying their respective motions.

Both Olga Torres and Pedro Bonilla were employees of Bella Vista Hospital in Mayagüez, Puerto Rico, for thirty or more years.  (Docket No. 124-2, at 1, ¶¶ 3, 4.)  Bella Vista Hospital was opened on January 4, 1954 and gained tax-exempt status under Puerto Rico law on June 26, 1965.  (Docket No. 127, at 6, ¶ 3.)  On January 1, 1982, the Hospital established a pension plan for its employees' benefit.  The intention when the plan was created was to subject the plan to the provisions of ERISA.  (Docket No. 124-2, at 4, ¶ 23; Docket No. 157, at 6, ¶ 23.)  The plan was administered by a Retirement Committee, which was appointed by the Hospital's Board of Trustees, who could relieve Retirement Committee members of their duties at any time.  Torres v. Bella Vista Hosp., Inc., 523 F. Supp. 2d at 129.  In 1990 the Hospital was incorporated under the laws of Puerto Rico as a non-profit corporation.  (Docket No. 127-2, at 34.)  On January 24, 1996, the United States Internal Revenue Service ("IRS") issued a letter declaring the Hospital tax-exempt under section 501(a)(c)(3) of the Internal Revenue Code

CIVIL 06-2158 (JAG)                              4

("IRC"), 26 U.S.C. § 501(c)(3).  (Docket No. 34-4.)  In its financial statements for the years 1995 and 1996, the Hospital included footnotes titled "Pension Plan" that stated in pertinent part, "The plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA)." Torres v. Bella Vista Hosp., Inc., 523 F. Supp. 2d at 129; (Docket No. 40-7, at 2; Docket No. 124-8). The 1995 footnote stated, however, that the Hospital was "in the process of requesting a ruling from the Internal Revenue Service to determine that their pension plan is a church plan under ERISA's definition and is therefore exempt from its requirements."  (Docket No. 124-8.)  It stated, "If a favorable ruling is received, this pension plan will be terminated and all funds will be transferred to the existing U. S. Church Plan covering many other hospitals throughout Latin America." (Id.)  In a letter dated March 15, 2000, however, the IRS declared that the plan was a church plan under the IRC.  (Docket No. 124-9, at 6.)  Then, on August 14, 2003, the plan was terminated and liquidated.  Torres v. Bella Vista Hosp., Inc., 523 F. Supp. 2d at 129.  Accordingly, plaintiffs did not receive the disability benefits to which they believed they were entitled under the plan.  Id. at 130.

       Of material consequence to the issue of whether the plan was a church plan is the extent of the relationship that the plan and the Hospital had with the Seventh-day Adventist Church ("Adventist Church").  "The Adventist Church is

CIVIL 06-2158 (JAG)                    5

administered by the General Conference of the Seventh-day Adventist ("General Conference")[.]"   (Docket No. 127, at 3, ¶ B1.)   The General Conference is partitioned into fifteen divisions, one of which is the Inter-American Division, headquartered in Miami.  (Id. at B2.)  The Inter-American Division, in turn, is divided into seventeen unions, one of which is the Puerto Rican Union Conference of the Adventist Church ("PR Union"), known formerly as the Antillean Union Conference of Seventh Day Adventists.  (Id. at ¶ B3.)  The PR Union is then divided according to the four cardinal directions within Puerto Rico.  (Docket No. 127-2, at 23.)

According to the 2008 Yearbook, a church directory published by the General Conference, the Adventist Church is an international Christian organization that pursues its mission of proclaiming its gospel through three methods, one of which is healing.  (Id. at 15.)  Regarding this method, the Yearbook says:

> Affirming the biblical emphasis on the well-being of the whole person, we make the preservation of health and the healing of the sick a priority and through our ministry to the poor and oppressed, cooperate with the Creator in His compassionate work of restoration.

(Id.)  To that end, the Adventist Church operates 168 hospitals and  sanitariums, and 442 health clinics and dispensaries worldwide.  (Id. at 14.)  The Yearbook's preface states that "[a] world directory of the Seventh-day Adventist Church is

CIVIL 06-2158 (JAG)                               6

given in the following pages." (Id.)  It reads, "Institutions that are managed *but not fully owned and operated by church entities* are *not* included."   (Id.) (emphasis added).  The Yearbook lists the Bella Vista Hospital.  (Id.)

The Hospital was founded with the help of a missionary physician of the General Conference.  (Docket No. 127, at 5, ¶ C1.)  The land upon which the Hospital sits is registered to the General Conference, and the General Conference is responsible for a mortgage on that property.  (Id. at 10, ¶ C11; Docket No. 127-4, at 2, ¶ 6; Docket No. 152-7, at 1.)   The Hospital's Certificate of Incorporation, dated June 21, 1990, states that it is a "nonprofit organization organized and operated exclusively for charitable, religious, scientific and educational purposes." (Docket No. 127-2, at 35.) "The specific purposes of th[e] Corporation are to further the medical ministry of the Seventh-day Adventist Church and 'to make man whole' physically, mentally and spiritually." (Id.) The Hospital's by-laws state that "[t]he Bella Vista Hospital is operated by the Antillian Union Conference of Seventh Day Adventists [the previous name for the PR Union], who delegates upon a Board of Trustees to run the Hospital." (Id. at 46.) The by-laws also provide that 10 of the 19 members of the Board of Trustees are to be either a president, secretary, or treasurer of some subdivision of the

CIVIL 06-2158 (JAG)                    7

Adventist Church.[1]  "There has never been a member of the Board that [was] not an active member of the Adventist Church."  (Docket No. 127, at 8, ¶ C7.)[2] Decisions made by the Board of Trustees must receive final approval from the Chairman of the Board, who is the President of the PR Union (Pastor J. Rodríguez). (Id. at ¶ C6; Docket No. 143, at 3, ¶ 24.)  Moreover, certain transactions into which the Hospital wishes to enter, such as the incurring of debt, for instance, must be approved by the PR Union, the Inter-American Division, and/or the General Conference.  (Docket No. 127, at 10-11, ¶ C12.)

---

[1] Required to be among this group are the President and Secretary of the Antillian Union Conference (PR Union), who are to be Chairman and Vice-President of the Board, respectively.  The group is also to include the Treasurer of the PR Union, who is to be the President of the Finance Committee.  Also to be included are the Health Secretary of the Antillian Union Conference (PR Union), the President and Treasurer of the Western Division of the PR Union, the President of the Eastern Division of the PR Union, the President of the Central Dominican Conference, and the respective Presidents of the North and South Dominican Missions of the Seventh-day Adventists.  The President of the Antillian College is also to be included, but it is not clear whether that individual is considered an officer of the Adventist Church.  (Docket No. 127-2, at 46-47.)

[2] This fact is one among many culled from defendants' statement of uncontested facts.  It is also one of many not denied by plaintiffs, but qualified with an allusion to the fact that the certificate of incorporation and by-laws of the Hospital are applicable to the Hospital's operations subsequent to the Hospital's incorporation in 1990.  It is unclear why a fact bears any greater or lesser significance or veracity if it pertains to the period before or after the Hospital's incorporation.  In any event, these attempts by plaintiffs to generate genuine issues of material fact prove unsuccessful.

CIVIL 06-2158 (JAG)                                  8

At one point in the late 1990s, the Hospital entered into a contract with the Adventist Healthcare System, which the Adventist Church created to administer hospitals.  (Id. ¶ C13; Docket No. 143, at 4, ¶ 31.)  When the Hospital was not able to pay the $8 million it owed under the contract, the Adventist Healthcare System forgave the debt.  (Id.)  Hospital executives, including the executive and finance directors, have been flown to the United States to attend seminars sponsored by the Inter-American Division of the Adventist Church.  (Docket No. 127, at 14, ¶ D11.)  Theological matters pertaining to the doctrines of the Adventist Church and its expansion plans have been addressed at these seminars. (Id.)

Only 30% of employees at the Hospital are active members of the Adventist Church.   (Docket No. 127, at 13, ¶ D9.)   Upon commencement of their employment, however, they are shown a video demonstrating the Hospital's relationship to the Adventist Church.  (Id. at 11, ¶ D2.)  The Employee Manual stresses the importance of "serving our patients and the community by restoring man to the image of God" "within a Christian environment."  (Id. at 12 D3 & D4; Docket No. 127-3, at 7 & 10.)   The Employee Manual also contains other references to the importance of God, Christianity, and the Adventist Church.  (Id.) While at work, employees of the Hospital are expected to adhere to certain vegetarian dietary restrictions that conform to the beliefs of the Adventist Church.

CIVIL 06-2158 (JAG)                    9

(Docket No. 127, at 9, ¶ C7.)  The Hospital also observes the Sabbath, provides chapel services, and enforces a dress code in conformity with the ideals of the Adventist Church.  (Id.)  The PR Union also publishes a book of rules of conduct that are applicable to the Hospital.  (Docket No. 127, at 5, ¶¶ B9 & B10; Docket No. 143, at 2, ¶¶ 15 &  16.)

III.    SUMMARY JUDGMENT STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A genuine issue exists when, based on the evidence, a reasonable jury could resolve the issue in favor of the non-moving party."  Napier v. F/V Deesie, Inc., 454 F.3d 61, 66 (1st Cir. 2006) (citing Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of P.R., 167 F.3d 1, 7 (1st Cir. 1999)).  "Further, a fact is material if it has the 'potential to affect the outcome of the suit.'"  Id. (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)).

It is ordinarily the moving party's burden to show "an absence of evidence to support the nonmoving party's case."  Napier v. F/V Deesie, Inc., 454 F.3d at 66 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  In evaluating a motion for summary judgment, "we take the facts in the light most favorable to

CIVIL 06-2158 (JAG)                    10

the non-moving party. . . ."  CMI Capital Mkt. Inv., LLC v. González-Toro, 520 F.3d 58, 61 (1st Cir. 2008) (citing Cash v. Cycle Craft Co., 508 F.3d 680, 682 (1st Cir. 2007)).  Where, as here, there are cross-motions for summary judgment, the basic Rule 56 standard is not altered, "but rather [the cross-motions] simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Curbelo-Rosario v. Instituto de Banca y Comercio, Inc., 248 F. Supp. 2d 26, 29 (D.P.R. 2003) (quoting Adria Int'l Group v. Ferre Dev., 241 F.3d 103, 107 (1st Cir. 2001)).  "The happenstance that both parties move simultaneously for brevis disposition does not, in and of itself, relax the taut line of inquiry that Rule 56 imposes."  Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996).  "'Barring special circumstances, the nisi prius court must consider each motion separately, drawing inferences against each movant in turn.'"  Id.  (quoting EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 603 n.8 (1st Cir. 1995)).

IV.    DISCUSSION

The issue before me is whether the pension plan established by defendants for the benefit of plaintiffs fits the definition of a "church plan" under ERISA.  "The provisions of [ERISA] shall not apply to any employee benefit plan if . . . such plan is a church plan . . . with respect to which no election has been made under section 410(d) of Title 26[.]"  29 U.S.C. § 1003(b)(2).  "Where a suit is brought

CIVIL 06-2158 (JAG)                    11

solely to recover benefits under a church plan, 'no federal question [exists] because the plan [is not] covered by ERISA.'" Geter v. St. Joseph Healthcare Sys., Inc., 575 F. Supp. 2d 1244, 1248 (D.N.M. 2008) (quoting Lown v. Cont'l Cas. Co., 238 F.3d 543, 547 (4th Cir. 2001)). "In that case, a federal court would not have jurisdiction to hear the claim." Id. The sole basis for subject matter jurisdiction asserted by plaintiffs is pursuant to 28 U.S.C. § 1331 (federal question) via ERISA. Plaintiffs assert that the court also has supplemental jurisdiction over their state law claims. Thus, if I find that the plan is a church plan, and that ERISA therefore does not apply, I must recommend that all of plaintiffs' claims be dismissed.

As a threshold matter, I find that defendants have made no election under 410(d) of Title 26. Section 410(d) provides that a church may elect to subject its pension plan to the purview of ERISA "in such form and manner as the Secretary may by regulations prescribe." 26 U.S.C. § 410(d)(1). Those regulations provide that an election under section 410(d) must contain a statement indicating "(I) that the election is made under section 410(d) of the Code and (ii) the first plan year for which it is effective." (Docket No. 73, at 7 (citing 26 C.F.R. § 1.410(d)-1(c)(5)). While defendants acknowledged that the pension plan was controlled by ERISA on more than one occasion in the mid-1990s, there is no indication anywhere in the record that defendants ever explicitly stated that they were

CIVIL 06-2158 (JAG)                           12

making an election under section 410(d) of the Code or that there was a particular

year in which the plan would first become effective.  Accordingly, "[b]ecause no

§ 410(d) election was made, ERISA will not apply if the plan is in fact a 'church

plan.'"  (Docket No. 73, at 7.)

ERISA defines a "church plan" as

> a plan established and maintained (to the extent required
> in clause (ii) of subparagraph (B)) for its employees (or
> their beneficiaries) by a church or by a convention or
> association of churches which is exempt from tax under
> section 501 of Title 26."

29 U.S.C. § 1002(33)(A).  The term "church plan" does not include a plan

established primarily for the benefit of church employees "who are employed in

connection with one or more unrelated trades or businesses. . . ."  Id. §

1002(33)(B)(I).  If, however, a plan is not established or maintained by a church

or convention or association of churches, and even if it primarily benefits

employees  connected to an unrelated trade, it may still qualify as a church plan

under subsection 33(C)(I).  Lown v. Cont'l Cas. Co., 238 F.3d at 547 ("Despite

this [section 1002(33)(B)(I)] exception to the definition of a church plan, a plan

established by a corporation associated with a church can still qualify as a church

plan.").  Subsection 33(C)(I) provides that a church plan

> includes a plan maintained by an organization . . . the
> principal   purpose   or   function   of   which   is   the
> administration  or  funding  of  a  plan  or  program  for  the

CIVIL 06-2158 (JAG)                        13

> provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is [1] controlled by; or [2] associated with a church or a convention or association of churches.

29 U.S.C. § 1002(33)(C)(I).  As the 2007 report and recommendation stated,

> section 1002(33)(C)(I) does not 'require' that the plan be maintained by an organization the principle purpose of which is administering or funding the plan.  The statute merely 'includes' such plans in the definition of church plan. . . . [The intent of (C)(I)] is to require that if an organization controlled by or associated with a church wants to hire an administrator for its plan, the administrator must also be controlled by or associated with the church.

(Docket No. 73, at 8) (quoting Friend v. Ancillia Sys. Inc., 68 F. Supp. 2d 969, 973 (N.D. Ill.)) (citing Peter J. Wiedenbeck, ERISA's Curious Coverage, Wash. U.L.Q. 311, n.178 (1998)).

Thus, the plan qualifies as a church plan if the employees are "employees of a church or a convention or association of churches" and if their organization, the Hospital, is controlled by or associated with a church.  Employees of a church include those whose employer is exempt from tax under section 501 of the IRC and is controlled by or associated with a church.  29 U.S.C. § 1002(33)(C)(ii)(II). Here, the Hospital was incorporated as a non profit corporation under the laws of Puerto Rico in 1990.  (Docket No. 127-2, at 34.)  The IRS ruled on January 24,

CIVIL 06-2158 (JAG)                        14

1996 that the Hospital is tax exempt under section 501(c)(3).[3] (Docket No. 34-4.)  Plaintiffs have essentially admitted that this IRS ruling was correct.  They acknowledge that "Bella Vista Hospital Inc. is a non profit corporation . . ." and their statement of uncontested facts states that "[s]uch determination [that the Hospital was exempt under section 501] was made on January 24 1996 by the Internal Revenue Services [sic]."  (Docket No. 143, at 3, ¶ 26; Docket No. 124-2, at 4, ¶¶ 30, 31.)  I therefore find that the Hospital is indeed exempt under section 501.

The next question is whether the Hospital is "controlled by or associated with" the Adventist Church.  A finding in the affirmative will mean not only that the Hospital's employees qualify as "church employees" under section 1002(C)(ii)(II), but more importantly that the plan is in fact a church plan under § 1002(33)(C)(I).  "ERISA does not define 'controlled by.'"  Catholic Charities of Me., Inc. v. City of Portland, 304 F. Supp. 2d 77, 85 (D. Maine 2004).  One

---

[3] The IRS also issued a ruling on March 15, 2000 that the plan is a church plan.  (Docket No. 124-9.)  As the 2007 report and recommendation noted, however, the "ruling does not constitute binding precedent on this court." (Docket No. 73, at 12) (citing 26 U.S.C. § 6110(k)(3)).  Moreover, the letter was based "entirely upon the Hospital's representations," and "holds little procedential or persuasive value" "where the plaintiffs [had] not been given the opportunity to advocate their position."  (Docket No. 73, at 12.)

CIVIL 06-2158 (JAG)                           15

example[4] of how a church is deemed to control an organization is if "a majority of [the organization's] officers or directors are appointed by a church's governing board or by officials of a church."    26 C.F.R.  1.414(e)-1(d)(2); see Coleman-Edwards v. Simpson, No. 03-3779, WL 820021, at *12 (E.D.N.Y.  Mar. 25, 2008) (quoting Lown v. Cont'l Cas. Co., 238 F.3d at 547).  Here, the PR Union appoints the "top management positions" at the Hospital, including, but not limited to the Executive Director (Administrator), Finance Director, Human Resources Director, and Medical Director.  (Docket No. 127, at 10, ¶ C8.)  None of the members of the Board of Trustees are appointed by the Adventist Church's governing board or officials, but the Hospital bylaws require that 10 of the 19 board members be either president, secretary, or treasurer of some subdivision of the Adventist Church itself.  (Docket No. 127-2, at 46-47.)  In other words, while the majority of the board members are not appointed by church officials, it would appear that 10 of the members are *themselves* church officials.  Surely, if the appointment of board members by church officials is sufficient to show church control, the fact that the board members themselves are church officials would constitute an even stronger showing of such control.    Unfortunately   for defendants, however, the record still remains underdeveloped as to the extent of

---

[4] Indeed, this is the only example provided in the statute or regulations of how church "control" is demonstrated.

CIVIL 06-2158 (JAG)                    16

responsibility and power wielded by these board members within the Adventist Church.  It is still conceivable, for instance, that these presidents, secretaries, and treasurers are really just lay people employed elsewhere with full-time, secular jobs that are in fact far removed from true official capacity within the Adventist Church or its "governing board."  Genuine issues of material fact on this point therefore remain.  It is true that this method of demonstrating church control over an organization provided by 26 C.F.R. 1.414(e)-1(d)(2) is only one "example" of how control by or association with a church may be demonstrated.  I find, however, that without further legislative or judicial guidance, genuine issues of material fact remain as to whether the church exercises control over the Hospital.

The question thus becomes whether the Hospital is associated with the Adventist Church.  "An organization . . . is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches."  29 U.S.C. § 1002(33)(C)(iv); <u>Lown v. Cont'l Cas. Co.</u>, 238 F.3d at 547; 26 C.F.R. 1.414(e)-1(d)(2).  While the First Circuit has yet to establish a framework for interpreting this standard, several decisions have adopted the three factors enunciated by the Fourth Circuit in <u>Lown v. Cont'l Cas. Co.</u>:

> In deciding whether an organization shares such common bonds and convictions with a church, three factor bear primary consideration: 1) whether the religious institution

CIVIL 06-2158 (JAG)                    17

> plays any official role in the governance of the organization; 2) whether the organization receives assistance from the religious institution; and 3) whether a denominational requirement exists for any employee or patient/customer of the organization.

Lown v. Cont'l Cas. Co., 238 F.3d at 548, quoted in Chronister v. Baptist Health, 442 F.3d 648, 653 (8th Cir. 2006); Coleman-Edwards v. Simpson, 2008 WL, at *12; Goetz v. Greater Ga. Life Ins. Co., 554 F. Supp. 2d 831, 835 (E.D. Tenn. 2008).  As to the first factor, the Hospital's bylaws provide that the Hospital is "operated by the Antillian Union [PR Union] Conference of the Seventh Day Adventists. . . . "  (Docket No. 127-2, at 46.)  They also provide that "[t]he policies and philosophy established by the Board of Trustees shall be reasonable and consistent with the general philosophy of the Antillian Union [PR Union] Conference of Seventh Day Adventists." (Id.)  To that end, the "Reglamento de la Unión Puertorriqueña," a book of regulations published by the PR Union, "provides . . . criteria and rules that must be observed by church employees when interacting with other employees and their employers, and by church entities when interacting with each other.  These rules are applicable to employees of the PR Union, PR Union associations, missions and institutions, including Bella Vista." (Docket No. 127, at 5, ¶ B10; Docket No. 143, at 2, ¶ 16.)  Moreover, the President of the PR Union, Pastor J. Rodríguez, is the Chairman of the Board of Trustees according to the bylaws, and must approve any resolution reached by the

CIVIL 06-2158 (JAG)                    18

Hospital's Board of Trustees.  (Docket No. 127, at 8, ¶ C6.)  See Catholic Charities of Me., Inc. v. City of Portland, 304 F. Supp. 2d at 85 (defining a plan as a church plan due in part to the fact that the "Bishop of Portland essentially controls the Board of Directors").  In the same vein, the approval of either the Inter-American Division or the General Conference is required for certain transactions above a pre-determined threshold, including, for example, the sale of the Hospital. (Docket No. 127, at 10-11, ¶ C12.)  See Catholic Charities of Me., Inc. v. City of Portland, 304 F. Supp. 2d at 85 (plan was a church plan where plan administrator could not sell any property or assets without Diocesan Bishop's approval).  Finally, the General Conference's directory lists only institutions that are "managed" and "fully owned and operated by church entities," and the Hospital appears in that directory.  (Docket No. 127, at 4, ¶¶ B6 & B7; Docket No. 127-2, at 14 & 24; Docket No. 143, at 2, 12 & 13.)    See Catholic Charities of Me., Inc. v. City of Portland, 304 F. Supp. 2d at 85 (the fact that plan administrator was listed in annual Catholic directory contributed to ultimate finding that administrator shared "common religious bonds and convictions with that church"); see also Friend v. Ancillia Sys. Inc., 68 F. Supp. 2d at 972.  The sum of all of these facts is sufficient to conclude that the church played at least some official role in the governance of the Hospital, and that the first Lown factor favors defendants.

CIVIL 06-2158 (JAG)                    19

The second <u>Lown</u> factor also weighs in favor of finding that the plan is a church plan, as there is undisputed evidence that the church supports the Hospital.  The Adventist Healthcare System, a creation of the General Conference, has forgiven over $8 million of debt owed by the Hospital.  Moreover, the General Conference allows the Hospital to operate upon land that the General Conference owns.  This is made possible at least in part due to a mortgage taken by the General Conference.

As to the third factor, the Hospital imposes no denominational requirement on its employees or patients, but such a requirement is not necessary to establish an association with the Adventist Church.  See <u>Catholic Charities of Me., Inc. v. City of Portland</u>, 304 F. Supp. 2d at 85 (finding organization was associated with church even though "there [was] nothing in the record to suggest that [the organization] impose[d] a denominational requirement on its employees or those who receive its services . . . ").[5]  Rather than impose such a requirement, the

---

[5] The Hospital's Employee Manual reads:

> The Bella Vista Hospital does not discriminate based on religious beliefs.  This right is always respected.  We hope that every employee who becomes part of our work team identifies with our service philosophy and works in accordance with it.

(Docket No. 152-6, at 8.)  Indeed, even the organization most closely controlled by or associated with a church would seem wise to adhere to such a non-discriminatory policy.  To do otherwise could be to risk employment discrimination

CIVIL 06-2158 (JAG)                          20

Hospital cultivates attitudes and behavior that conform to the Seventh-day Adventist belief system, and that demonstrate "common religious bonds and convictions with that church."  In a section of the Hospital's Employee Manual entitled "Christian Beliefs," the Hospital states:

> The Bella Vista Hospital has had solid Christian beliefs since its origins.  These are an essential part of its existence, since the Hospital's foundation and purpose are based on them.  This institution was developed by members of the Church of the Seventh-day Adventists following a burning desire to serve God by serving humanity.

(Docket No. 152-6, at 8.)  The Mission Statement within the Employee Manual refers to patient treatment in a "Christian environment" and lists "Christianity" as one of its three objectives.  (Id. at 7.)  On a more concrete level, the Hospital imposes the tenets of the Adventist Church's vegetarian principles on its employees, prohibiting them from eating meat in the cafeteria or in clinical areas.  (Id. at 11.)  The Hospital also provides a chapel with an Adventist pastor, observes the Sabbath by closing much of its facility on Saturdays, and imposes a conservative dress code on its employees.  (Docket No. 127, at 9, ¶ C7.)  Ranking members of the PR Union have admonished the Executive Director of the

suits and the potential legal consequences of turning away needy patients on the basis of religion.  Moreover, turning away patients in need might also conflict with the the Christian ideals espoused by the Hospital and Adventist Church.

CIVIL 06-2158 (JAG)                      21

Hospital in the past for lapses in dress code adherence.  (Id.)  Considering the totality of these undisputed facts, I find that each of the three Lown factors favor a determination that the Hospital is associated with the Adventist Church.

An additional set of factors that courts have applied include whether:

> a religious order or congregation controls the entities sponsoring the plan; the operation of the organization furthers the goals of the religious order; the entity and/or the religious order are listed in an official religious directory; the organization is a not-for-profit tax exempt entity pursuant to § 501 of the Internal Revenue Code; and members of the religious order sit on the board of directors of the organization.

Friend v. Ancillia Systems Inc., 68 F. Supp. 2d at 972, quoted in Goetz v. Greater Ga. Life Ins. Co., 554 F. Supp. 2d at 836.  As stated above, the issue of whether the Adventist Church controlled the Hospital is not ripe for summary judgment, but the Hospital clearly furthers the church's goal of healing, one of its three main "methods" for fulfilling its mission.  (Docket No. 127-2, at 15.)  Additionally, the Hospital is listed in the church's directory, and it is tax-exempt under section 501 of the IRC.  Finally, 10 members of church subdivisions sit on the Hospital's Board of Trustees.  Accordingly, this set of factors also weighs substantially in favor of finding the pension plan to be a church plan.

It is true that the 2007 report and recommendation found that the plan was not a church plan.  (Docket No. 73, at 13.)  The court did not adopt the report and

CIVIL 06-2158 (JAG)                           22

recommendation as to the issue at hand, however, because the record lacked the development necessary "to narrow areas of factual dispute." Torres v. Bella Vista Hosp., Inc., 523 F. Supp. 2d at 135.  Due to the year of discovery that followed the court's decision, many new facts not previously available are now before the court, and they elucidate the degree of the Hospital's association with the Adventist Church.

Moreover, the two cases upon which the report and recommendation relied are distinguishable.  Those cases both addressed the issue of whether a healthcare organization that administered a pension or disability plan was controlled by or associated with a church convention.  Lown v. Cont'l Cas. Co., 238 F.3d 547; Chronister v. Baptist Health, 442 F.3d 651-53.  In Lown, the healthcare system had removed itself as an agency of the religious convention well before the plaintiff filed a claim for disability benefits under her disability plan, and the convention had ratified this decision.  Lown v. Cont'l Cas. Co., 238 F.3d at 546, 548 (finding that the healthcare system was not associated with or controlled by the religious convention).  Furthermore, whereas the healthcare organization in Lown received "no monies" from the religious convention after the two organizations parted ways, the Adventist Healthcare System has forgiven over $8 million of debt owed by the Hospital, and the General Conference allows the Hospital to operate upon its land, which it has mortgaged.

CIVIL 06-2158 (JAG)                    23


Chronister v. Baptist Health is also distinguishable.  Whereas strong ties still exist between the Hospital and the Adventist Church, the healthcare provider in Chronister had "severed its ties" to the church nearly 40 years prior to the litigation.  Chronister v. Baptist Health, 442 F.3d at 652 (finding the plan in question was not a church plan).  Also, unlike this case, there was "no evidence that [the healthcare organization] received any support from the [church] after its dissociation."  Id. at 653.

V.    CONCLUSION

I find that the Hospital shares common religious bonds and convictions with the Adventist Church.  As such, it is associated with the Adventist Church under section 1002(33)(C)(iv) of ERISA.  Because it is also a non-profit entity under section 501 of the IRC, its employees are church employees under section 1002(33)(C)(ii)(II). Thus, because the Hospital maintains a plan that is for church employees, and because the hospital is associated with a church, its plan is a church plan under section 1002(33)(C)(I).  Accordingly, the plan does not fall under the purview of ERISA pursuant to section 1003(b)(2).  I find no remaining genuine issues of material fact and conclude that defendants are entitled to judgment as a matter of law.  I therefore recommend that defendants' motion be GRANTED, that plaintiffs' motion be DENIED, and that the case be DISMISSED for lack of subject matter jurisdiction.

CIVIL 06-2158 (JAG)                            24

At San Juan, Puerto Rico, this 13th day of April, 2009.

                                    S/ JUSTO ARENAS
                         Chief United States Magistrate Judge